[Cite as *State v. Moore*, 2023-Ohio-4445.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29677 |
| | : | |
| v. | : | Trial Court Case No. 2019 CR 04138 |
| | : | |
| DMAUGHN DAVION STOLINGS MOORE | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 8, 2023

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant Dmaughn Davion Stolings Moore appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of several counts of felony murder, felonious assault, discharge of a firearm on or hear a prohibited premises, and multiple firearm specifications. In support of his appeal, Moore claims that the trial court erred by sentencing him to two five-year firearm specifications for offenses

that were part of the same act or transaction, in violation of R.C. 2929.14(B)(1)(c)(iii). The State concedes error in that regard, and, for the reasons discussed in this opinion, we agree that Moore's sentence is in violation of R.C. 2929.14(B)(1)(c)(iii).

{¶ 2} Moore also claims that his trial counsel provided ineffective assistance by failing to object to the trial court's imposition of two five-year firearm specifications. In addition, Moore claims that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. For the reasons outlined below, the judgment of the trial court will be reversed only as to the portion of Moore's sentence that imposed two five-year firearm specifications. Moore's conviction will be affirmed in all other respects, and the matter will be remanded to the trial court for the sole purpose of resentencing Moore to one five-year firearm specification.

**Facts and Course of Proceedings**

{¶ 3} On December 23, 2019, a Montgomery County grand jury returned a ten-count indictment charging Moore with two counts of felony murder, five counts of felonious assault, and three counts of discharge of a firearm on or near prohibited premises. Each of the felony murder and felonious assault counts included a three-year firearm specification and a five-year firearm specification. The counts for discharge of a firearm on or near a prohibited premises also included a three-year firearm specification.

{¶ 4} The indicted charges and specifications stemmed from a drive-by shooting that took place on Thanksgiving Day in 2019. It was alleged that Moore, while driving through a residential neighborhood in Dayton, Ohio, fired multiple gunshots at a truck

parked on Kenwood Avenue as the occupants of the truck were exiting the vehicle. The driver of the truck, David Blane, was shot and killed as a result of the gunfire. Blane's infant daughter, N.B., who sustained no injuries, and Blane's brother, Brian Murphy, who was shot multiple times in both legs, were passengers in the truck at the time of the shooting. The charges for which Moore was indicted were broken down as follows with regard to each of the three victims.

Victim: David Blane

- **Felony murder** (felonious assault – serious physical harm)
  R.C. 2903.02(B), unclassified felony

- **Felony murder** (felonious assault – deadly weapon)
  R.C. 2903.02(B), unclassified felony

- **Felonious assault** (serious physical harm)
  R.C. 2903.11(A)(1), second-degree felony

- **Felonious assault** (deadly weapon)
  R.C. 2903.11(A)(2), second-degree felony

- **Discharge of a firearm on or near prohibited premises**
  R.C. 2923.162(A)(3)/(C)(4), first-degree felony

Victim: Brian Murphy

- **Felonious assault** (serious physical harm)
  R.C. 2903.11(A)(1), second-degree felony

- **Felonious assault** (deadly weapon)
  R.C. 2903.11(A)(2), second-degree felony

- **Discharge of a firearm on or near prohibited premises**
  R.C. 2923.162(A)(3)/(C)(4), first-degree felony

Victim: N.B.

- **Felonious assault** (deadly weapon)

R.C. 2903.11(A)(2), second-degree felony

- **Discharge of a firearm on or near prohibited premises**
  R.C. 2923.162(A)(3)/(C)(4), first-degree felony

{¶ 5} Moore pled not guilty to all the charges and specifications, and his case proceeded to a jury trial. During trial, the State presented testimony from several witnesses including Blane's brother, Murphy; Murphy and Blane's mother, Deana Collins; Murphy and Blane's sister, Halee Collins; Deana and Halee's neighbor, Elizabeth Dehring; and Moore's sister, Trezure Porter. The State also presented testimony from multiple investigating police officers, the paramedics who treated the victims at the scene of the shooting, a forensic DNA expert, a firearms expert, a fingerprint analyst, and the coroner who examined Blane's body. The following is a summary of the relevant information presented at Moore's trial.

*Relevant Information From Trial*

{¶ 6} On November 28, 2019, Blane drove his brother, Murphy, and his infant daughter to attend Thanksgiving Day dinner at Blane and Murphy's mother's house on 227 Kenwood Avenue. When they arrived in the area, Blane parked his blue Chevrolet pickup truck on Kenwood Avenue across the street from his mother's residence. As Blane and Murphy were getting out of Blane's truck, they discussed how the street was full of cars due to the holiday. When Blane was halfway out of the driver's seat, and while Murphy was removing the baby carrier from the back-passenger compartment, Murphy heard tires screech and saw a dark-colored SUV, later identified as a Toyota RAV4, speed toward them. Murphy then saw the RAV4 slow down and briefly stop

alongside the driver's seat of Blane's truck. At that moment, Murphy heard gunshots and saw a gun firing at them from the passenger-side window of the RAV4.

{¶ 7} As gunshots were being fired, Murphy got the baby out of the truck and placed her baby carrier behind the passenger door of Blane's truck. Murphy, who had a concealed carry license, then proceeded to return fire at the RAV4 with a semiautomatic handgun that he had on his person. Shortly thereafter, Murphy heard a crash and saw that the RAV4 had flipped upside down on Kenwood Avenue just a few houses down from where Blane had parked his truck. Murphy was unable to see how many people were in the RAV4 and had no idea who had fired the gunshots. Murphy did, however, recall seeing the RAV4 parked down the street before it had sped up beside Blane's truck.

{¶ 8} When Murphy went to pick up N.B. in her baby carrier, his legs gave out and he fell down on the sidewalk. At that point, he realized that he was bleeding and had been shot. Murphy did not know where Blane was or if Blane had been injured during the shooting. Responding officers and paramedics discovered Blane lying face down, unresponsive, in a nearby yard with a .40 caliber Glock tucked in his waistbelt. Blane and Murphy were both taken to the hospital, where Blane died of multiple gunshot wounds to his torso. Murphy had suffered multiple gunshot wounds to both of his legs, which required surgery and nine months of physical therapy. N.B., on the other hand, had suffered no injuries from the shooting.

{¶ 9} Elizabeth Dehring, who lived across the street and a few houses down from Blane and Murphy's mother on Kenwood Avenue, heard the gunshots on the day in question and called 9-1-1 to report the shooting. Dehring reported looking out of her

window and seeing an injured man on the ground with a baby carrier. Dehring also reported seeing a RAV4 flipped over on Kenwood Avenue and a black male wearing black pants and a black hoodie or hooded jacket running north toward Kenilworth Avenue. Dehring testified that the man she saw running came out of the RAV4 that had flipped over, and that the man ran in between houses that were located across the street from her residence. Dehring did not know whether anyone else came out of the RAV4.

{¶ 10} Blane and Murphy's mother, Deana Collins, heard gunshots from the shooting while she was in her kitchen preparing dinner. After hearing the gunshots, Deana and her daughter, Halee, went outside and saw that a RAV4 had flipped over in front of their house on Kenwood Avenue. When Deana and Halee went outside, they stopped on their front porch when they heard a thumping noise coming from the RAV4 and saw a black male wearing a black jacket come out of the vehicle carrying a gun. Deana later told an investigating detective that the man's black jacket was a "shiny, black bubble coat" or "puffy jacket." Trial Tr. p. 478-479. Deana also observed that the man was wearing a black ski hat or toboggin over his head. Deana testified that the man ran down the side of her house toward the back, which is north toward Kenilworth Avenue. Deana also testified that she did not see the shooting or crash happen and that she called 9-1-1 to report the gunfire before she had realized her sons and granddaughter were outside.

{¶ 11} Blane and Murphy's sister, Halee, also saw a black male wearing a black jacket running from the area of the RAV4 while carrying a gun. After the man in the black jacket was out of sight, Halee went over to the RAV4 and took pictures of it with her cell

phone. While taking pictures, Halee noticed that there was a lit cigarette with smoke coming off it in the driver-side compartment of the RAV4. Halee's photographs of the cigarette were admitted into evidence as State's Exhibit 22 and 23.

{¶ 12} An unidentified 9-1-1 caller also reported the shooting on Kenwood Avenue. The audio recording from that call established that the unidentified caller had observed two people lying on the ground and one person running away. Trial Tr. Vol. V, p. 865-866; Defendant's Exhibit F. The caller advised that the suspect running away was a black male wearing a black and white coat and jeans. *Id*. The caller also indicated that the suspect was running south toward Rockwood Avenue and the Dayton Art Institute. *Id*.

{¶ 13} A canine unit was called to the scene to attempt to track the suspect who had run from the RAV4. The canine led officers a few blocks north before losing the suspect's scent. Around the same time, an investigating officer ran the RAV4's license plate through the police department's LEADS system and determined that the RAV4 was an Enterprise rental vehicle. The officer contacted Enterprise and determined that the vehicle had been rented to an individual named Trezure Porter.

{¶ 14} When Porter was first questioned by the police, she told officers that she had rented the RAV4 from Enterprise on November 4, 2019, because her own vehicle had been stolen. Porter also advised the officers that on November 11, she had given the RAV4 to an individual named Donovan Moore because she was able to secure another vehicle. Porter identified a picture of Donovan Moore from Facebook and told the officers that the individual in the picture was the person to whom she had given the

RAV4.

{¶ 15} After further investigation, officers discovered that Donovan Moore was on electronic home detention and wore a GPS monitoring system; the system provided information showing that he had been in Harrison Township the entire day of the shooting. After learning this information, the officers went back to Porter and confronted her with what they had learned about Donovan Moore. In response, Porter admitted to the officers that she had been untruthful with them and that she had no idea who Donovan Moore was. Porter then told the officers that she had actually given the RAV4 to her brother, Dmaughn Moore. Porter also provided the officers with Moore's phone number and identified Moore in a surveillance video that was taken from a local supermarket.

{¶ 16} The supermarket surveillance video was obtained after an investigating officer ran the RAV4's license plate in the police department's information system and learned that the RAV4 had an associated field interview card. The field interview card documented another officer's encounter with the RAV4 on November 21, 2019, at the supermarket in question. Investigating officers thereafter went to the supermarket and obtained surveillance video footage from November 21, 2019, which was later used to identify Moore.

{¶ 17} The evidence technician who photographed and collected evidence at the scene of the shooting testified that there were four bullet strikes on the driver's side of Blane's truck. The photographs admitted into evidence showed that the bullet strikes were all on the back passenger door of the truck and on the truck bed. *See* State's Exhibits 37-39. The evidence technician also testified that there were bullet holes in a

coat located in the backseat of Blane's truck in the area where the baby carrier had been. The evidence technician also collected bullet fragments that were located inside the rear passenger floorboard of Blane's truck.

{¶ 18} In addition to that evidence, the evidence technician collected a cell phone that was located in a compartment of the RAV4's front driver-side door. Although the cell phone was locked, the lead detective was able to determine that the cell phone matched the phone number that Porter had given for Moore by using the cell phone's emergency function to call 9-1-1 and asking the responding operator to provide him with the number from which he had called. After identifying Moore's cell phone, it was sent to the Federal Bureau of Investigation ("FBI") for analysis. The FBI extracted the contents of Moore's cell phone and provided the contents to the Dayton Police Department. After reviewing the cell phone's contents, the lead detective discovered that at 3:21 p.m. on November 28, 2019, approximately 18 minutes before the shooting was called into 9-1-1,[1] an Apple Maps search was entered on the cell phone for directions to 227 Kenwood Avenue.

{¶ 19} DNA testing confirmed that blood found on the driver-side airbag of the RAV4 belonged to Moore. Moore's blood was also found on the RAV4's rearview mirror and on a $20 bill that had been inside the RAV4. Although there was no blood on the passenger-side airbag, DNA from an unknown male contributor that was not Moore was detected on the airbag. DNA testing also confirmed that Moore was the major DNA contributor on the partially-smoked cigarette that was collected from the driver-side

---

[1] The 9-1-1 incident detail report established that the shooting incident was first reported at 3:39 p.m. on November 28, 2019. Trial Tr. Vol. II, p. 253.

compartment of the RAV4. Moore's DNA and fingerprints were also found on a mason jar that was collected from the driver-side floorboard of the RAV4.

*Verdict and Sentencing*

{¶ 20} After presenting the foregoing evidence, the State rested its case. The defense then made a Crim.R. 29 motion for acquittal, which the trial court overruled. As part of its jury instructions, the trial court advised the jury that Moore could be found guilty either as the principal offender, i.e., as the shooter, or as an aider and abettor under the theory of complicity. The jury thereafter deliberated and found Moore guilty as charged in the indictment.

{¶ 21} At sentencing, the trial court merged all of the felony murder and felonious assault counts that related to Blane. The State then elected to have Moore sentenced for the count of felony murder that was based on the predicate offense of felonious assault by causing serious physical harm. For that offense, the trial court sentenced Moore to 15 years to life in prison plus an additional three and five years in prison for the attendant firearm specifications. The trial court ordered the firearm specifications to be served consecutively to the sentence imposed for felony murder. Accordingly, Moore was sentenced to a total of 23 years to life in prison for that offense.

{¶ 22} The trial court also merged the two felonious assault counts related to Murphy, and the State elected to have Moore sentenced on the count alleging serious physical harm. The trial court imposed a minimum term of eight years in prison to a maximum term of 12 years in prison for that offense, plus an additional three and five

years in prison for the attendant firearm specifications. The trial court once again ordered the firearm specifications to be served consecutively to the sentence imposed. Accordingly, Moore was sentenced to a total minimum term of 16 years to a total maximum term of 20 years in prison for the felonious assault of Murphy.

{¶ 23} For the felonious assault of N.B., the trial court sentenced Moore to three years in prison. The trial court ordered that sentence and the sentences imposed for the felony murder of Blane and the felonious assault of Murphy to be served consecutively to one another. The trial court then merged all three counts of discharge of a firearm on or near a prohibited premises and imposed a six-year prison term for that offense. The trial court ordered the six-year prison term to be served concurrently with all the other sentences. Moore was therefore sentenced to an aggregate minimum term of 42 years to a maximum term of 46 years to life in prison.

{¶ 24} Moore now appeals from his convictions and raises four assignments of error for review.

**First Assignment of Error**

{¶ 25} Under his first assignment of error, Moore contends that the trial court erred by sentencing him to two five-year firearm specifications in violation of R.C. 2929.14(B)(1)(c)(iii). The State concedes error in this regard, and we agree that Moore's sentence is in violation of R.C. 2929.14(B)(1)(c)(iii).

{¶ 26} When reviewing felony sentences, we must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002,

59 N.E.3d 1231, ¶ 7. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either: (1) the record does not support the sentencing court's findings under certain enumerated statutes, or (2) the sentence is otherwise contrary to law. *Id.* at ¶ 9, citing R.C. 2953.08(G)(2). The Supreme Court of Ohio has recognized that "otherwise contrary to law" means " ' "in violation of statute or legal regulations at a given time." ' " *State v. Bryant*, 168 Ohio St.3d 250, 2022-Ohio-1878, 198 N.E.3d 68, ¶ 22, quoting *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 34, quoting *Black's Law Dictionary* 328 (6th Ed.1990).

**{¶ 27}** In this case, Moore's conviction for felony murder as to Blane and his conviction for felonious assault as to Murphy each included a five-year firearm specification under R.C. 2941.146. A firearm specification under R.C. 2941.146 concerns the discharge of a firearm from a motor vehicle and is known as a drive-by specification. R.C. 2929.14(B)(1)(c)(iii) provides that a sentencing court shall not impose more than one additional prison term on an offender for a five-year drive-by specification "for felonies committed as part of the same act or transaction." In other words, "R.C. 2929.14(B)(1)(c)(iii) limits imposing a single five-year sentence on the 'drive-by' specification and provides that they must merge with the same five-year firearm specification in other counts 'for felonies committed as part of the same act or transaction.' " *State v. Jarmon*, 8th Dist. Cuyahoga No. 106727, 2018-Ohio-4710, ¶ 27, quoting R.C. 2929.14(B)(1)(c)(iii). (Other citation omitted.)

**{¶ 28}** The Supreme Court of Ohio has defined the term "transaction" as a " 'series

of continuous acts bound by time, space and purpose, and directed toward a single objective.' " *State v. Wills*, 69 Ohio St.3d 690, 691, 635 N.E.2d 370 (1994), quoting *State v. Caldwell*, 9th Dist. Summit No. 14720, 1991 WL 259529 (Dec. 4, 1991). In *Jarmon*, the Eighth District Court of Appeals applied this definition to a scenario where the defendant had fired multiple gunshots at rival gang members from a car window. The Eighth District determined that "the multiple shots fired at the rival gang members were the same transaction," and that the trial court was therefore permitted to impose only one five-year drive-by specification for offenses arising from that conduct. *Jarmon* at ¶ 28, citing *State v. Phillips*, 8th Dist. Cuyahoga No. 96329, 2012-Ohio-473, ¶ 41 (holding that multiple shots fired into a vehicle were the same transaction). The trial court in *Jarmon*, however, had sentenced the defendant to two five-year drive-by specifications—one for attempted murder and one for improperly discharging a firearm at a habitation. *Id.* The Eighth District held that by imposing a five-year drive-by specification for each of those offenses, the trial court had violated the limitation imposed in R.C. 2929.14(B)(1)(c)(iii). *Id.*

{¶ 29} Upon review, we find that *Jarmon* is analogous to the present case. The State concedes, and we agree, that Moore's felony murder and felonious assault offenses occurred during the same act or transaction, as both offenses arose from the drive-by shooting at 227 Kenwood Avenue. Despite this, the trial court sentenced Moore to a five-year drive-by specification for each of those offenses. By imposing more than one five-year drive-by specification for felonies that were part of the same act or transaction, the trial court violated the limitation set forth in R.C. 2929.14(B)(1)(c)(iii). For this reason,

we clearly and convincingly find that Moore's sentence is contrary to law. Accordingly, Moore's sentence must be reversed, and the matter must be remanded to the trial court for the sole purpose of resentencing Moore to only one five-year drive-by specification.

{¶ 30} Moore's first assignment of error is sustained.

## Second Assignment of Error

{¶ 31} Under his second assignment of error, Moore contends that he was denied his Sixth Amendment right to effective assistance of counsel due to his trial counsel's failure to object to the trial court's sentencing him to two five-year firearm specifications. Moore's ineffective assistance of counsel claim is moot given that we have already determined that his sentence is contrary to law and that the matter will be remanded for resentencing.

{¶ 32} Moore's second assignment of error is overruled.

## Third Assignment of Error

{¶ 33} Under his third assignment of error, Moore contends that all of his convictions for felony murder, felonious assault, discharge of a firearm on or near a prohibited premises, and the attendant firearm specifications were against the manifest weight of the evidence. Specifically, Moore claims that all of his convictions should be reversed because the weight of the evidence established that there was a second person in the RAV4 at the time of the shooting, and there was no evidence specifically identifying him as the shooter. Moore also claims that there was no evidence supporting his

conviction under the theory of complicity.

{¶ 34} Although Moore designated his third assignment of error as a manifest weight claim, his supporting argument presents issues pertaining to the sufficiency of the evidence as well. "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 35} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State*

*v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 36} In this case, even if we were to accept Moore's manifest weight claim, i.e., that the weight of the evidence established that there was a second person in the RAV4 at the time of the shooting and that this second person was the individual who fired gunshots at the victims, all of Moore's convictions would still be viable under the theory of complicity. Pursuant to R.C. 2923.03(A)(2), the theory of complicity extends criminal liability to those who "[a]id or abet another in committing the offense" while "acting with the kind of culpability required for the commission of an offense." R.C. 2923.03(A)(2). "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶ 37} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001). *Accord State v. Hatfield*, 2d Dist. Montgomery No. 28990, 2022-Ohio-148, ¶ 51. " '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Johnson* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982); *Hatfield* at ¶ 51. However, " '[p]articipation in criminal intent may be inferred

from presence, companionship and conduct before and after the offense is committed.' " *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971); *Hatfield* at ¶ 51.

{¶ 38} In this case, the State presented a plethora of evidence establishing that Moore was the driver of the RAV4 at the time of the November 28, 2019 drive-by shooting. The testimony of Moore's sister, Trezure Porter, established that she had given the RAV4 to Moore approximately 17 days before the shooting. The surveillance video footage from the local supermarket established that Moore was still using the vehicle one week before the shooting. DNA evidence established that Moore's blood was on the RAV4's rearview mirror and the driver-side airbag, which had deployed when the RAV4 overturned on Kenwood Avenue. DNA evidence also established that Moore was the major DNA contributor on the partially smoked cigarette that was collected from the driver-side compartment of the RAV4. The testimony of Blane and Murphy's sister, Halee, established that the cigarette still had smoke coming off it after the crash, which indicated that Moore had been smoking the cigarette in the area of the driver's compartment near the time of the shooting. Moore's DNA and fingerprints were also detected on a mason jar that was collected from the RAV4's driver-side floorboard. In addition, Moore's cell phone was collected from a compartment in the driver's door of the RAV4. When viewing all this evidence in a light most favorable to the State, a rational factfinder could have concluded that Moore was the driver of the RAV4.

{¶ 39} Despite all the foregoing evidence establishing that Moore was driving the RAV4 at the time of the shooting, Moore claims that the State failed to present any

evidence proving that he had supported, assisted, encouraged, cooperated with, advised, or incited the shooter in the commission of the offenses in question. According to Moore, the evidence merely established that he had unexpectedly become a getaway driver, and that there was no evidence indicating that he had shared the criminal intent of the shooter. We, however, disagree.

{¶ 40} The data collected from Moore's cell phone established that 18 minutes before the shooting was called into 9-1-1, someone, presumably Moore, had entered an Apple Maps search for directions to 227 Kenwood Avenue—the residence of Blane and Murphy's mother/the location of the drive-by shooting. The fact that this search was conducted on Moore's cell phone so close in time to the shooting suggested that Moore did not unexpectedly become a getaway driver. Rather the search on his phone and the timing of the search suggested that Moore had been involved in a plan to commit the drive-by shooting at 227 Kenwood Avenue and thus shared the criminal intent of the shooter.

{¶ 41} Moore's criminal intent was further demonstrated by Murphy's trial testimony. Murphy testified that he had noticed that the RAV4 in question was parked down the street on Kenwood Avenue before it sped up to them. Murphy also testified that after the RAV4 sped up to them, it slowed down alongside Blane's truck while someone inside the vehicle fired the gunshots. As previously discussed, there was ample evidence that Moore was driving the RAV4 at the time of the drive-by shooting. Accordingly, the evidence established that Moore drove the RAV4 to the location searched for on his cell phone, parked the RAV4 on Kenwood Avenue, waited for Blane

and Murphy to arrive in the area, and then drove by them in a manner that facilitated the drive-by shooting, i.e. by slowing down next to Blane's truck.

{¶ 42} When all the aforementioned evidence is viewed in a light most favorable to the State, a reasonable factfinder could have concluded that Moore assisted the shooter in conducting the drive-by shooting and also shared the shooter's criminal intent. Accordingly, there was sufficient evidence to convict Moore of all the offenses and firearm specifications that arose from the drive-by shooting under the theory of complicity. Upon review, we also find that such a conclusion would not have been against the manifest weight of the evidence.

{¶ 43} Moore's third assignment of error is overruled.


**Fourth Assignment of Error**

{¶ 44} Under his fourth assignment of error, Moore contends that his conviction for felonious assault against N.B. was not supported by sufficient evidence because the State failed to present any evidence establishing the requisite culpable mental state for that offense, i.e., that he acted knowingly. We disagree.

{¶ 45} As previously discussed, "[a] sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525 at ¶ 10, citing *Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541. "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to

the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *Dennis*, 79 Ohio St.3d at 430, 683 N.E.2d 1096. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 46} As related to N.B., Moore was convicted of felonious assault in violation of R.C. 2903.11(A)(2). Under that statute: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). Because N.B. was not physically harmed during the shooting incident in question, to secure a conviction under R.C. 2903.11(A)(2), the State was required to prove that Moore knowingly attempted to cause physical harm to N.B. by means of a deadly weapon. Moore claims that the State failed to do so because it did not present any evidence establishing that he knew N.B. was present at the time of the shooting. That is, Moore claims the State failed to establish the culpable mental state for felonious assault, i.e., that he *knowingly* attempted to cause physical harm to N.B.

{¶ 47} R.C. 2901.22(B) defines "knowingly" as follows:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is

a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶ 48}** Ohio's Sixth and Eighth appellate districts have held that the firing of a weapon into an area without knowledge of its occupants is sufficient to establish a knowing attempt to cause physical harm for the purpose of a felonious assault conviction. *See, e.g., State v. Hill*, 6th Dist. Lucas No. L-18-1160, 2020-Ohio-1237, ¶ 19-20 (holding that the knowingly element of felonious assault was sufficiently established where "appellant indiscriminately fired a gun into an area without knowledge of how many individuals he might endanger" because "the firing of a weapon into an area without knowledge of its occupants * * * is sufficient to establish a knowing attempt to cause physical harm"); *State v. Elko*, 8th Dist. Cuyahoga No. 83541, 2004-Ohio-5209, ¶ 54 ("[f]iring a pistol into a window, without knowing who could be behind it, satisfies a knowing attempt to cause physical harm"), *overruled in part on other grounds*, *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498; *State v. Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 6 ("firing a weapon randomly at victims arguably within range of the shooter is sufficient to demonstrate actual intent to cause physical harm"). In a drive-by shooting case involving five victims, this court similarly noted that "intent to cause physical harm to the five individuals could be inferred from [the defendant's] having shot a gun randomly in the direction of each individual." *State v. Phillips*, 75 Ohio App.3d 785, 792, 600 N.E.2d 825 (2d Dist.1991).

**{¶ 49}** In *State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992), when determining whether there was sufficient evidence to establish that the defendant had

knowingly attempted to cause physical harm to a bystander of a bank robbery, the Supreme Court of Ohio evaluated whether the bystander was "in the line of fire."  *Id*. at 369.   Because the bystander was not found to have been in the line of fire, the *Mills* court concluded that there was insufficient evidence to establish that the defendant had knowingly attempted to cause the bystander physical harm and thus reversed the felonious assault conviction associated with the bystander.  *Id*.

{¶ 50} With regard to drive-by shootings, the United States District Court for the Northen District of Ohio has held that "anyone within the 'target range' in a drive-by shooting is 'in the line of fire' for purposes of a felonious assault charge."  *Robinson v. Lazaroff*, N.D.Ohio No. 1:15 CV 426, 2017 WL 385737, *3 (Jan. 26, 2017).  *See also Ivory* at ¶ 9 (proximity to drive-by shooting victim placed another "in the same line of fire").

{¶ 51} Here, the State presented evidence establishing that Murphy was in the process of getting N.B. out of the back seat of Blane's truck when Moore drove by in the RAV4 as it was discharging gunfire.   The State also presented evidence establishing that both Blane and Murphy were shot, that Blane's truck had multiple bullet strikes on its driver's side, and that bullet fragments were located inside the truck's rear passenger floorboard.   The evidence further established that there were bullet holes in a coat located in the back seat of Blane's truck in the area where N.B.'s baby carrier was located.

{¶ 52} When considering the location of the bullet strikes and bullet fragments in/on Blane's truck, the fact that Blane and Murphy were shot during the incident, and N.B.'s close proximity to the truck and Blane and Murphy, a reasonable fact finder could have concluded that N.B. was in the target range of the drive-by shooting and thus was

in the line of fire.   Contrary to Moore's claim otherwise, it is irrelevant that Moore may have been unaware of N.B.'s presence at the time of the shooting. *See Hill*, 6th Dist. Lucas No. L-18-1160, 2020-Ohio-1237, at ¶ 19; *Elko*, 8th Dist. Cuyahoga No. 83541, 2004-Ohio-5209, at ¶ 54.   It is enough that Moore's conduct was of such a nature that he would have been aware it could have caused someone inside or near the truck to become physically injured.   *See* R.C. 2901.22(B).   Therefore, when the aforementioned evidence is viewed in a light most favorable to the State, a rational factfinder could have determined that Moore knowingly attempted to cause N.B. physical harm by means of a deadly weapon when he engaged in or aided and abetted the drive-by shooting at 227 Kenwood Avenue.

{¶ 53} Moore's fourth assignment of error is overruled.


**Conclusion**

{¶ 54} Having sustained Moore's first assignment of error, and having overruled all the other assignments of error raised by Moore, the judgment of the trial court is reversed only as to the portion of Moore's sentence that imposed two five-year firearm specifications.   Moore's conviction is affirmed in all other respects, and the matter shall be remanded to the trial court for the sole purpose of resentencing Moore to one five-year firearm specification.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.