[Cite as *State v. Mollett*, 2025-Ohio-2826.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

CARL L. MOLLETT,

    DEFENDANT-APPELLANT.

CASE NO. 1-24-35

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court
Trial Court No. CR2023 0234

Judgment Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Decision: August 11, 2025

APPEARANCES:

    *Kimberly E. Burroughs and Stephen P. Hardwick* for Appellant

    *John R. Willamowski, Jr.* for Appellee

Case No. 1-24-35

**MILLER, J.**

{¶1} Defendant-Appellant, Carl L. Mollett ("Mollett"), appeals from the April 22, 2024 judgment of the Allen County Court of Common Pleas following a jury trial and sentencing. Mollett argues that certain jury instructions misled the jury and usurped its role as factfinder; that the trial court failed to provide required notifications during the sentencing hearing; and that the trial court imposed an aggregate sentence that is impermissibly disproportionate to the seriousness of his offenses. For the reasons that follow, we affirm in part, reverse in part, and remand for a limited resentencing.

## I. FACTS AND PROCEDURAL HISTORY

{¶2} On July 28, 2023, Mollett was aware there was a warrant for his arrest, pursuant to an indictment issued from Franklin County.[1] That morning, a multi-agency law enforcement team determined that Mollett was present at a small house in Lima, Ohio owned by his father. The eventual charges against Mollett in this case—five counts of felonious assault, each with a firearm specification and a repeat violent offender specification, and two counts of having weapons while under disability—arose from the law enforcement team's attempt to serve the arrest warrant at that house.

---

[1] In addition to stipulating to this fact, the parties also stipulated that Mollett was previously convicted of a felony offense of violence.

{¶3} After a planning meeting, the law enforcement team arrived at Mollett's father's house. Once there, they surrounded and proceeded to repeatedly knock loudly on the doors of the house and announce their presence and purpose. After approximately 30 minutes had passed with no response, they decided to use a battering ram to open the front door.

{¶4} Four officers went to "the immediate area of the doorway" at the front of the house, one carrying a battering ram and another carrying a ballistic shield. (Trial Tr. at 219-220). The door opened after two swings of the battering ram, the officer with the ballistic shield rushed in front of the group to the now-open doorway with his shield up, and another one of the officers started to make an announcement indicating the officers' presence. They were "all very close" to the doorway. (*Id.* at 219). Within seconds of the door being breached, each of the four officers heard gunshots coming from within the house. They began to back out of the doorway and retreat to cover. Those four officers—Officers Elliot, Oney, Fleming, and Tebo—were identified as victims in four of the five counts for felonious assault.

{¶5} Officer Tebo testified that, after retreating away from the doorway, he was still trying to communicate with Mollett, but "[e]very time [he] would call out [to Mollett] there would be more shots fired." (*Id.* at 279). The shots fired consisted of "multiple more volleys of gunfire," including bullets that Officer Tebo saw hit the ground outside. (*Id.* at 285). All four officers testified to additional instances of gunshots being fired from the house after they had retreated from the doorway.

Then, approximately five minutes after they had broken down the front door, a man yelled from inside the house, "I'm not going back" (or "I'm not going back to prison"). Officer Elliot, who was the team leader, requested a S.W.A.T. team to assist.

{¶6} Deputy Mitchell Scott ("Deputy Scott") was the alleged victim in the remaining count for felonious assault. He was assisting the team in attempting to serve the warrant. His role was to be the marked unit, i.e., he was in uniform with a cruiser identified with markings of the sheriff's office. Upon arriving at the house, Deputy Scott parked his cruiser in the driveway and kept watch outside near the driver door while the four-person team breached the front door of the house. The driveway runs in a straight line from the right side of the small house and straight down the open, virtually featureless front yard to the street. After the initial volley of shots was fired from the house, Deputy Scott sought cover behind his cruiser. At that time, the next volley of gunshots went off and a pile of dirt flew up near Deputy Scott, consistent with a bullet striking the ground. Notably, none of the five officers referenced above returned any gunfire during the incident, and none of them were injured by the gunfire.

{¶7} Detective Hunlock was part of the Hostage Negotiation Team during the incident. He was the intelligence liaison, listening to the negotiator's conversations and taking notes as to the context of the conversation. At trial, he testified that, during negotiations with Mollett over the phone, Mollett told the

negotiator the situation "was not going to be resolved peacefully. It was going to be resolved by several body bags. People were going to die. . . . [I]f anyone tried to go into the residence he would kill them." (Trial Tr. at 370). Detective Hunlock also testified that, in response to the negotiator asking Mollett to "put his gun down and come out," Mollett said that was not going to happen. (*Id.* at 371). Additionally, the negotiator asked Mollett "why he shot at law enforcement, and [Mollett] stated because they had kicked his door in." (*Id.*).

{¶8} The commander of the S.W.A.T. team, who was one of the officers initially securing the perimeter, testified that the gunshots came from inside the house based upon their sound. Eventually, his S.W.A.T. team arrived and took over the scene. Mollett and a female (later identified as Mollett's girlfriend) eventually exited the house, and they both were taken into custody.

{¶9} Mollett's father was not present at the house during the incident. He testified that he had multiple firearms in his house, including three nine-millimeter pistols, along with ammunition.

{¶10} Mollett's girlfriend was present in the house during the incident. She testified that in late June 2023 (i.e., several weeks prior to the incident) she was made aware that Mollett had an indictment issued against him out of Franklin County. The day before the incident, she and Mollett had arrived at Mollett's father's house and spent the night there. The next morning, she and Mollett observed law enforcement outside the house, and Mollett told her, "F*ck—the

Sheriffs are here." (Trial Tr. at 317). She and Mollett were the only people at the house at the time. When law enforcement busted in the front door, she was sitting in a bedroom with her head between her knees.

{¶11} Mollett's girlfriend also testified about certain statements she made during an interview with detectives shortly after being taken into custody. She told the detectives that Mollett stated, during the incident, that he was going to be leaving in a body bag because he did not want to go to jail for something he did not do. When law enforcement broke down the door, Mollett exited the bedroom and went into a hallway. She also admitted to telling detectives she believed Mollett had a black handgun during the incident and that Mollett shot the gun during the incident. However, she added that she was not one-hundred-percent sure that Mollett had a gun and that she did not actually see him shoot a gun. She also admitted she still loved Mollett and had been speaking with him frequently the week prior to trial. She testified that she never had a gun and never shot a gun during the incident.

{¶12} Finally, Deputy Cress was the identification officer at the scene. He documented, collected, preserved, and processed the evidence following the incident. He located several handguns, two boxes of ammunition (including nine-millimeter bullets), and spent nine-millimeter bullet casings on the floor in various areas of the home—including several feet into the residence essentially in line with the front door. (*See* Trial Tr. at 448-463, 469; State's Exhibits 2, 8-9, 12-14, 30, 47). Deputy Cress also testified about a bullet hole on the front wall *inside* the home

very close to the door frame of the broken-down front door. (*See* Trial Tr. at 465-467; State's Exhibits 37-42). He investigated the hole and found a bullet fragment imbedded inside that hole.

{¶13} Mollett was found guilty on all counts and specifications, including:

Counts One, Two, Three, Four, and Five – Felonious assault in violation of R.C. 2903.11(A)(2), first-degree felonies, each with an accompanying firearm specification pursuant to R.C. 2941.1412(A) and repeat violent offender specifications pursuant to R.C. 2941.149(A);

Count Six – Having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony; and

Count Seven – Having weapons while under disability in violation of R.C. 2923.13(A)(1), a third-degree felony.

{¶14} The trial court held a sentencing hearing on April 22, 2024. Prior to the hearing, the trial court ordered the preparation of a pre-sentencing investigation report. At the hearing, the court referenced that it had reviewed the report, which set forth Mollett's prior record, and highlighted a prior second-degree felony burglary conviction. The trial court found Mollett had not responded favorably to sanctions previously imposed for prior convictions. His Ohio Risk Assessment Score indicated a high risk of reoffending.

{¶15} During the hearing, the trial court also referenced its own observation of the trial testimony and noted "the facts were pretty straight-forward." (Apr. 22, 2024 Tr. at 1, 16). It found Mollett's conduct to be "unacceptable in any kind of civilized world" and was "terrible with respect to all victims"—each of whom were

law enforcement officers doing their job. (*Id.* at 21-24). It also found that Mollett "put all kinds of people at risk" and that, "when you fire a gun in the direction of human beings there's at least an attempt to cause some physical harm," even if it turned out that no one was physically hurt in this case. (*Id.*).

{¶16} On the same day as the sentencing hearing, the trial court issued its Judgment Entry of Sentencing. The court found that counts 6 and 7 merged (and the State elected to proceed on Count 7), but Counts 1, 2, 3, 4, and 5 did not merge. It also found that the sentences in Counts 1, 2, 3, 4, and 5 were mandatory and sentenced Mollett to an indefinite prison term of 7 to 10-1/2 years on each of those five counts.[2] It sentenced Mollett to a mandatory prison term of seven years on each of the firearm specifications. Additionally, it sentenced Mollett to a prison term of 36 months on Count 7. Finally, it found that (1) the R.C. 2941.1412(A) firearm specification sentences imposed on Counts 1 and 2 would run consecutive to each other and be served prior to the sentences on the underlying counts, and (2) the prison terms imposed on counts 1, 2, 3, 4, 5, and 7 would run consecutively to each other.[3] The end result was an aggregate prison sentence of 52 to 55-1/2 years (49 years of which was mandatory time). This appeal followed.

---

[2] In discussing the repeat-violent-offender specifications in Counts 1 through 5, the trial court explained it would not impose additional prison time for those specifications, referencing that it had not imposed the maximum sentence on any of the underlying counts.
[3] The seven-year prison terms imposed for the specifications on Counts 3, 4, and 5 would run concurrently to each other and to the consecutive specification terms.

## II.    ASSIGNMENTS OF ERROR

{¶17} Mollett raises three assignments of error for our review:

**First Assignment of Error**

**The trial court's jury instructions regarding the 'knowingly' mens rea element of Felonious Assault misled the jury and usurped their role as factfinder in violation of Mr. Mollett's due process right to a fair trial.**

**Second Assignment of Error**

**Mr. Mollett's indefinite sentence was imposed contrary to law because the trial court failed to provide the required advisements under R.C. 2929.19(B)(2)(c) at his sentencing hearing.**

**Third Assignment of Error**

**Mr. Mollett's mandatory 52 to 55.5-year aggregate consecutive prison term is disproportionate to the seriousness of his offense because it is effectively a life sentence, and yet his conduct caused no physical harm or loss of life.**

## III.    DISCUSSION

### A.    First Assignment of Error

{¶18} In the first assignment of error, Mollett argues that, in its jury instructions, the trial court expanded the meaning of "knowingly," as applied to felonious assault charges, in a manner that misled the jury and interfered with the jury's role as fact-finder. According to Mollett, the trial court added "inferences drawn from sufficiency-of-the-evidence appellate decisions" to the pattern jury instruction regarding the definition of "knowingly." (Appellant's Brief at 7).

{¶19} Mollett acknowledges that these additional instructions at issue "do not appear to be incorrect statements of law when stated abstractly," but contends

the resulting instructions on the definition of "knowingly" violated the law for two reasons. (*Id.* at 8-15). First, the instructions were misleading because the added instructions were inapplicable, or at least incomplete, based on the evidence presented. Second, they did not give the jury the freedom to credit or reject the inferences in the added instructions. For example, Mollett cites the trial court's telling the jury, "A person can be convicted of a Felonious Assault if an alleged victim is in the line of fire," as an example of the erroneous nature of the instructions eliminating the mens rea requirement and directing the jury to convict him of the felonious assault charges.

{¶20} Mollett claims the jury instructions regarding the "knowingly" element for felonious assault violated his due process protections. He also argues the trial court's alleged error in giving those instructions was not harmless because Mollett's guilt was not established beyond a reasonable doubt despite the error. He asks that we vacate his convictions and remand the matter for a new trial.

### 1. Applicable Law

{¶21} A person commits felonious assault when he or she knowingly causes or attempts to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A defendant need not foresee the exact consequences of his actions"; to be actionable, it is only necessary that the

-10-

result is within the natural and logical scope of risk created by the conduct. *State v. Hathorn*, 2023-Ohio-3936, ¶ 28 (3d Dist.); *see also State v Conway*, 2006-Ohio-791, ¶ 143 (it is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts).

{¶22} A firearm is an inherently dangerous instrument, the use of which is likely to produce death. *State v. Seiber*, 56 Ohio St.3d 4, 14 (1990). Notably, the act of "[i]ntentionally shooting toward or in the vicinity of another person when there is a risk of injury meets the 'knowingly' element of felonious assault." *State v. Wilson*, 2024-Ohio-776, ¶ 24. In fact, firing a gun in a person's direction is sufficient evidence of felonious assault. *State v. Markley*, 2015-Ohio-1890, ¶ 41 (3d Dist.); *see also State v. Phillips*, 75 Ohio App.3d 785, 792 (2d Dist. 1991). For example, in *Phillips*, during a drive-by shooting, bullets that the defendant fired repeatedly and randomly in the direction of several people struck a chain link fence behind two children and a person shielding one of those children, struck cement under their feet, and struck a woman's house and entered her home—breaking the window above her head—while another bullet broke the glass in an interior door behind the woman's son. *Phillips*, 75 Ohio App.3d at 787. The appellate court affirmed the defendant's convictions for five counts of felonious assault concerning those five victims. *Id.* at 792 (defendant's "intent to cause physical harm to the five individuals could be inferred from his having shot a gun randomly in the direction of each individual"); *see also State v. Hubbard*, 2013-Ohio-2735, ¶ 23 (10th Dist.)

-11-

("[w]hen a person fires a gun into a group of people, one can infer intent to cause death").

### 2. Standard of review

**{¶23}** For purposes of resolving this assignment of error, we will assume, without deciding, that the jury instructions at issue were improper.[4] *E.g., State v. Williams*, 2002-Ohio-3623, ¶ 38 (3d Dist.) (any potential error in the jury instructions at issue was harmless beyond a reasonable doubt even if those instructions should not have been given); *State v. Tyler*, 2019-Ohio-4661, ¶ 53 (9th Dist.) (without assessing whether the instruction was erroneous, the record reflected that any error would be harmless beyond a reasonable doubt). Mollett objected to the jury instruction at trial; therefore, we will review for harmless error. *State v. Jones*, 2020-Ohio-3051, ¶ 18; *State v. Knuff*, 2024-Ohio-902, ¶ 194 ("[h]aving determined that the trial court erred when it instructed the jury . . . we must evaluate whether the error was harmless"). The State contends there was no error, but even if there was, any error was harmless given the evidence presented at trial.

**{¶24}** The rule for harmless error provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). The State bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *Jones* at ¶ 18. "Whether

---

[4] We specifically do not pass on the appropriateness of the jury instructions at issue, which were cobbled together from various statements of law, some of which appear to be taken out of the factual context of their case.

the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial." *Id.* If the trial court's error in instructing the jury "was harmless beyond a reasonable doubt," then we will not reverse the defendant's conviction on that basis. *Knuff* at ¶ 197; *see also State v. Montgomery*, 2022-Ohio-2211, ¶ 25 (a constitutional trial error is harmless when the state demonstrates beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained); *State v. Noggle*, 140 Ohio App.3d 733, 749 (3d Dist. 2000) (involving erroneous jury instruction; to be deemed nonprejudicial, error of constitutional dimension must be harmless beyond a reasonable doubt). "An appellate court is required to reverse the conviction when the State is unable to meet its burden." *Jones* at ¶ 18.

### 3. Analysis

{¶25} We find the State has met its burden in demonstrating that any error in the jury instructions regarding the "knowingly" element of felonious assault did not affect Mollett's substantial rights. Based on the entire record, we determine that any error in the jury instructions was harmless beyond a reasonable doubt.

{¶26} Evidence at trial showed that Mollett knew there was a warrant for his arrest, knew law enforcement had arrived at the house where he was staying, and was so upset at the situation that he stated physical harm would result. For example, Mollett's girlfriend testified he told her, "F*ck—the Sheriffs are here," and numerous law enforcement officers testified to the repeated, loud announcements

of their presence and purpose prior to the gunfire. Moreover, Mollett told the negotiator the situation "was not going to be resolved peacefully. It was going to be resolved by several body bags. People were going to die. . . . [I]f anyone tried to go into the residence he would kill them." (Trial Tr. at 370).

{¶27} The evidence at trial clearly supported a finding that Mollett fired a gun multiple times from inside the home in the direction of the five officers. For instance, Mollett's girlfriend testified there were only two people in the house and she never had a gun, and—while she was not "one-hundred-percent" sure that Mollett had a gun and she did not actually see him shoot a gun—she told detectives on the day of the incident that she believed Mollett had a gun during the incident and that Mollett shot the gun during the incident. Moreover, Detective Hunlock testified that Mollett said he would not "put his gun down and come out." (*Id.* at 371). Furthermore, and in addition to the testimony from the five victims, Deputy Cress testified concerning the multiple bullet casings in the house and the bullet hole next to the door frame where the officers were forced to withdraw from the residence. The evidence was consistent that Mollett shot multiple times through the doorway in the direction of the retreating officers, porch, front yard, and driveway beyond.

{¶28} The factual scenario presented here is similar to that in *State v. Hill*, 2020-Ohio-1237 (6th Dist.). In *Hill*, a S.W.A.T. team was executing a no-knock search warrant at the defendant's residence. *Id.* at ¶ 4. One member of the team

swung a battering ram into the front door, forcing it open, and the lead member then immediately rushed into the now-open doorway. *Id.* at ¶ 5. The defendant pointed a gun at the lead member and began firing. *Id.* at ¶ 6. The team retreated and remained outside the house until the defendant stopped shooting. *Id.* A police officer had been tasked with watching the exterior of the residence and, as the team breached the doorway, he was struck in the face by one of the bullets fired by the defendant. *Id.* at ¶ 7. No one else suffered physical injuries during the incident. *Id.* Nevertheless, the defendant was charged with seven counts of felonious assault of a peace officer—one count for each of the six S.W.A.T. team members and one count for the police officer who had been struck in the face. *Id.* at ¶ 9. The jury found the defendant guilty on all counts. *Id.*

{¶29} The appellate court in *Hill* affirmed the seven felonious assault convictions. *Id.* at ¶ 31. The defendant argued on appeal that, because he was unaware of the number of officers, he could not have knowingly attempted to cause those unknown officers physical harm. *Id.* at ¶ 14. The appellate court rejected the argument, explaining that "a defendant's knowledge of the number of potential victims is unnecessary in proving the elements of felonious assault." *Id.* at ¶ 15. The defendant "indiscriminately fired a gun into an area without knowledge of how many individuals he might endanger." *Id.* at ¶ 19. "[I]t is the firing of a weapon into an area without knowledge of its occupants that is sufficient to establish a knowing attempt to cause physical harm." *Id.* The victims occupied the area into

-15-

which the defendant fired and the State's evidence supported a finding as to the defendant's knowing attempt to cause them physical harm. *Id.* at ¶ 19-20, 26.

**{¶30}** Here, the jury instructions at issue did not affect the trial's outcome. It is irrelevant that Mollett may have been unaware of the specific locations of the five victims at the time he fired the multiple bursts of gunshots out the front of the house. The evidence demonstrated the five victims were in the line of fire, with bullets nearly striking each of them. His shooting in the direction of the front door when the officers breached it was enough to prove he acted knowingly. *Hill* at ¶ 14-15, 19-20, 26; *State v. Moore*, 2023-Ohio-4445, ¶ 52 (2d Dist.); *see also State v. Jeffers*, 2025-Ohio-989, ¶ 54 (2d Dist.) (collecting cases for proposition that firing a weapon into an area without knowledge of its occupants is sufficient to establish a knowing attempt to cause physical harm for the purpose of a felonious assault conviction). The evidence at trial overwhelmingly established the elements of felonious assault. Any error in the jury instructions at issue was, therefore, harmless. *Wilson*, 2024-Ohio-776, at ¶ 24; *Markley*, 2015-Ohio-1890, at ¶ 41 (3d Dist.) ("the jury could reasonably infer that [defendant] knowingly attempted to cause physical harm to [victim] since she fired her gun in [victim's] direction, putting him at risk of injury," despite defendant's statement that she did not try to harm the victim and fired her gun into the ground).

**{¶31}** Mollett's first assignment of error is overruled.

**B.** **Second Assignment of Error**

**{¶32}** In the second assignment of error, Mollett asserts that the trial court failed to advise him of the five mandatory notifications under R.C. 2929.19(B)(2)(c) when it imposed his indefinite sentences. The State concedes the trial court failed to provide all the required notifications at the sentencing hearing and this assignment of error should be sustained. We agree.

**{¶33}** Pursuant to R.C. 2929.19(B)(2), "if the sentencing court determines at the sentencing hearing that a prison term is necessary or required" and "[i]f the prison term is a non-life felony indefinite prison term," then the trial court must notify the offender of the advisements set forth in R.C. 2929.19(B)(2)(c)(i)-(v). However, the trial court is not required to provide a verbatim recitation of the information set forth in R.C. 2929.19(B)(2)(c)(i)-(v). *State v. Moore*, 2024-Ohio-4536, ¶ 15 (3d Dist.) (trial court's statements "satisfactorily informed" defendant of the notification required by R.C. 2929.19(B)(2)(c)(iii)).

**{¶34}** Here, the trial court was required to notify Mollett of the information set forth in R.C. 2929.19(B)(2)(c)(i)-(v) with respect to the prison terms imposed for the felonious assault offenses. However, based on our review of the sentencing hearing transcript, the trial court did not provide all of the required notifications. The trial court briefly explained indefinite sentencing, referenced the presumption that Mollett would complete his sentence on a count once the minimum sentence had been served, and alluded to the Department of Rehabilitation and Correction's

ability to keep Mollett imprisoned beyond the minimum sentence. Yet, for example, it did not notify Mollett of the process necessary for the department to keep Mollett imprisoned beyond the minimum sentence, including holding a hearing. *See* R.C. 2929.19(B)(2)(c)(ii)-(v).

{¶35} An indefinite prison sentence is contrary to law when the trial court fails to notify the offender at the sentencing hearing of all the information set forth in R.C. 2929.19(B)(2)(c). *State v. Radabaugh*, 2024-Ohio-5640, ¶ 69-71 (3d Dist.); *State v. Holland*, 2023-Ohio-4834, ¶ 93 (2d Dist.). Accordingly, we sustain this assignment of error and find that the portions of Mollett's sentence that impose an indefinite prison term are contrary to law. Consequently, we reverse solely with respect to Mollett's indefinite prison terms imposed for the offenses in counts one, two, three, four, and five and remand to the trial court for resentencing on those offenses in accordance with R.C. 2929.19(B)(2)(c). *Radabaugh* at ¶ 71; *Holland* at ¶ 96-97.

### C.  Third Assignment of Error

{¶36} In the third assignment of error, Mollett argues his aggregate sentence is disproportionate to the seriousness of his conduct within the meaning of R.C. 2929.14(C)(4)'s consecutive sentencing statute. The trial court, in deciding certain imposed prison terms would be served consecutively to each other, specifically found "that consecutive sentences are not disproportionate to the seriousness of the defendant's conduct and to the danger the defendant poses to the public," pursuant

to R.C. 2929.14(C). (Apr. 22, 2024 Judgment Entry at 5). Mollett contends "[t]he trial court's determination that an effective life sentence was not disproportionate to the seriousness of [his] conduct is clearly and convincingly not supported by the record." (Appellant's Brief at 19). He requests we either reduce his sentence to one proportionate to his conduct or remand the matter to the trial court for resentencing.

### 1. Applicable Law

{¶37} There is a statutory presumption in favor of concurrent sentences. R.C. 2929.41(A); *see also State v. Bonnell*, 2014-Ohio-3177, ¶ 23. An exception is found in R.C. 2929.14(C), the consecutive-sentencing statute, which at subdivision (c)(4) "requires the trial court to make statutory findings prior to imposing consecutive sentences." *Bonnell* at ¶ 26. The trial court must find: (1) the consecutive service is necessary either to protect the public from future crime or to punish the offender; (2) the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one of the factors in R.C. 2929.14(C)(4)(a), (b), or (c) applies. *See* R.C. 2929.14(C)(4); *State v. Elliston*, 2014-Ohio-5628, ¶ 12 (3d Dist.). Mollett specifically challenges the second prong and contends his consecutive prison sentence of 52 to 55-1/2 years is disproportionate to the seriousness of his conduct and any danger he poses to the public. R.C. 2929.14(C)(4).

{¶38} In deciding the appeal of a sentence that includes consecutive sentences, an appellate court "shall review the record, including the findings

underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statues [identified in R.C. 2953.08(G)(2)(a)] or that the sentence is otherwise contrary to law." *State v. Marcum*, 2016-Ohio-1002, ¶ 1; *see also* R.C. 2953.08(G). One of the relevant statutes identified in R.C. 2953.08(G)(2)(a) is R.C. 2929.14(C)(4) concerning consecutive sentencing. "'Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Marcum* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶39} The Supreme Court of Ohio recently considered the issue of disproportionate consecutive sentences in *State v. Glover*, 2024-Ohio-5195. The Court in *Glover* was divided, with Justice DeWine writing the lead opinion joined by two justices, Justice Fisher concurring in judgment and concurring in part with the lead opinion, and Justice Stewart writing the dissenting opinion joined by the remaining two justices. In his concurring opinion, Justice Fisher explained that he agreed with the lead opinion that "a sentence can be modified or vacated only when the appellate court 'clearly and convincingly finds' that the record does not support

-20-

the sentencing court's findings.'" *Glover* at ¶ 70-71 (Fisher, J., concurring in judgment and concurring in part); *see also id.* at ¶ 2 (lead opinion).

**{¶40}** However, Justice Fisher disagreed with the lead opinion regarding the proportionality review. He would "hold that in making a proportionality determination under R.C. 2929.14(C)(4), courts are required to consider the aggregate of all prison terms the offender will be required to serve consecutively." *Id.* at ¶ 67, 69 (Fisher, J., concurring in judgment and concurring in part). The dissent agreed with Justice Fisher on that issue, resulting in four justices agreeing that the trial court must consider the *aggregate* sentence, at least with respect to the proportionality prong of the consecutive-sentencing statute. *See id.* at ¶ 79 (Stewart, J., dissenting); *State v. Billings*, 2024-Ohio-6000, ¶ 40 (11th Dist.) (based on the opinions in *Glover*, "[i]t would therefore appear that trial courts (and appellate courts) must consider the aggregate term of imprisonment when imposing consecutive sentences under R.C. 2929.14(C)(4), but an appellate court may not substitute its judgment under the appellate standard of review"). Thus, we will consider Mollett's aggregate sentence in our review. *State v. McElroy*, 2025-Ohio-1356, ¶ 17, 30 (7th Dist.) (affirming the trial court's sentence following its review of the record, and consideration of the aggregate sentence, based on the opinions in *Glover*).

### 2. Analysis

**{¶41}** We reject Mollett's argument in his third assignment of error. We first note that, during the sentencing hearing, the trial court considered the aggregate prison term with respect to the proportionality prong of the consecutive-sentencing statute (Apr. 22, 2024 Tr. at 15, 23-26). *See Billings* at ¶ 42 (affirming sentence in accordance with *Glover* and explaining that "the transcript of the sentencing hearing demonstrates the trial court gave due consideration to the aggregate term of imprisonment it was imposing").

**{¶42}** The trial court found during the sentencing hearing that Mollett's conduct was "unacceptable in any kind of civilized world" and "terrible with respect to all victims"—each of whom were law enforcement officers simply doing their job. (Apr. 22, 2024 Tr. at 21-24). Although Mollett stresses in his appellate brief that he did not physically injure anyone through his conduct on July 28, 2023, the trial court pointed out during the sentencing hearing that he "put all kinds of people at risk" and found that "when you fire a gun in the direction of human beings there's at least an attempt to cause some physical harm." (*Id.* at 21-22). Mollett fired multiple volleys of gunfire from a deadly weapon in the direction of the five officers, nearly hitting each one. We also note the trial court did not impose maximum sentences for the felonious assault offenses nor did it impose any sentence for the repeat violent offender specifications.

{¶43} Ultimately, the record in this case does not clearly and convincingly fail to support the trial court's consecutive sentence findings.[5] R.C. 2953.08(G)(2); R.C. 2929.14(C)(4). Thus, we find Mollett's third assignment of error not well taken.

{¶44} Mollett's third assignment of error is overruled.

## IV. CONCLUSION

{¶45} For the foregoing reasons, Mollett's first and third assignments of error are overruled and his second assignment of error is sustained. We reverse with respect to the indefinite prison terms imposed for the offenses in counts one, two, three, four, and five. Having found error prejudicial to the appellant in the particulars assigned and argued, we remand this matter to the trial court with instructions to resentence Mollett in a manner consistent with this opinion. In all other respects, we affirm the judgment of the Allen County Court of Common Pleas.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**WALDICK, P.J. and ZIMMERMAN, J., concur.**

---

[5] Even if we apply the lead opinion's analysis from *Glover*, we reach the same conclusion. *Glover*, 2024-Ohio-5195, at ¶ 2, 42-46, 61.

# JUDGMENT ENTRY

For the reasons stated in the opinion of this Court, it is the judgment and order of this Court that the judgment of the trial court is affirmed in part and reversed in part with costs assessed equally between Appellant and Appellee for which judgment is hereby rendered. The cause is hereby remanded to the trial court for further proceedings and for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.


                Mark C. Miller, Judge


                Juergen A. Waldick, Judge


                William R. Zimmerman, Judge

DATED:
/jlm