**[Cite as *State v. Jeffers*, 2025-Ohio-989.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-28 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-0660 |
| | : | |
| DANNY JEFFERS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 21, 2025

. . . . . . . . . . .

ERIC J. ALLEN, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

**{¶ 1}** Danny Jeffers appeals from his convictions on three counts of felonious assault, each with a firearm specification. Because we find that the trial court erred in imposing a consecutive sentence on one of the firearm specifications, the judgment will

be reversed and remanded for resentencing solely on the third, discretionary firearm specification. In all other respects, the judgment of the trial court will be affirmed.

## Facts and Procedural History

{¶ 2} On October 2, 2023, Jeffers was indicted on three counts of felonious assault, each with a firearm specification. He was tried by a jury on March 26-27, 2024, and found guilty of the offenses and the specifications. On April 23, 2024, Jeffers was sentenced to an indefinite prison term of eight to 12 years for each felonious assault, plus three years for each of the firearm specifications. The court ordered the indefinite prison terms to be served concurrently and ordered all three firearm specifications to be served consecutively to the indefinite prison term and to each other, for an aggregate term of 17 to 21 years.

{¶ 3} Before addressing Jeffers's assignments of error, we will review the evidence adduced at trial. We begin with the State's evidence.

{¶ 4} Deputy Douglas Peterson of the Clark County Sheriff's Office testified that on August 4, 2023, he responded to a Ballentine Pike address, the home of Brian James, on a report of shots fired. Upon arrival, he learned from other officers at the scene that the shots came from the neighboring home where Jeffers lived, and Peterson was asked to check a shed on James's property for gunfire damage. Peterson, James, and Chief Michael Stitzel of the German Township Police Department proceeded to a metal shed to check for damage. They found bullet damage to the shed, and as they began to return to the area of James's home, they "started getting shot at."

{¶ 5} Having been exposed to gunfire previously, and based upon his training and

experience, Dep. Peterson estimated that the gunfire was very close because he heard a whistling sound near his head. He believed it was the closest that he had ever come to being shot and that he was the subject of deliberate gunfire. Peterson was carrying his department issued AR-rifle and a Glock 19. He testified that he would have returned fire if he had known where the shots were coming from. Peterson's body camera was played for the jury, and he testified that he had been walking backward to provide cover for James and Stitzel until they could reach an area of safety.

{¶ 6} Peterson testified that he had observed warning signs for a shooting range on Jeffers's property. He later observed Jeffers drive away from his property. Peterson stated that Jeffers had not been immediately detained because officers were waiting to learn from the prosecutor's office how Jeffers should be charged. At that time, Peterson had not known where Jeffers's backstop for his shooting range was located. Jeffers told officers that he did not know Peterson was on his property at the time of the shooting.

{¶ 7} Deputy Austin Bowers of the Clark County Sheriff's Office was also dispatched to James's home. Upon arrival, he observed a "massive" garage sale going on there and, after speaking to several patrons of the sale, he learned that the neighbor next door had been shooting a weapon of some kind. Bowers testified that when Jeffers was asked to show officers the backstop of his shooting range, Jeffers was initially reluctant but eventually did so, and the backstop "did look to be appropriate" from what the officers had seen. Jeffers then went back inside his home. As Dep. Bowers and Detective Brian Melchi passed by on their way to the area of the garage sale, they were approached by Jeffers at the front door; he asked if they wanted to see the weapon he

had been firing. Jeffers showed them the weapon on his front porch; it appeared to be a .223 caliber "partial front stock of AR-15 rifle with a drum magazine." As Bowers proceeded back to James's property to gather witness statements, he heard multiple gunshots very close to him coming from Jeffers's property. Bowers could feel "the bang" of the shots. Bowers testified that there had not been time for Jeffers to walk to his shooting range from his front porch before the gunshots began; Bowers believed that Jeffers had been shooting close to him, in proximity to his location. Melchi was near Bowers at the time. The gun was very loud, and Bowers estimated the shots were fired from 40-50 feet away.

{¶ 8} Brian James testified that he lived with his wife Amy, son Joseph, and Joseph's girlfriend, Alli. Jeffers and his girlfriend, Margaret, lived next door at the time of the shooting. James stated that his relationship with Jeffers had never been cordial, because Jeffers and Margaret "were not very nice people and they cause[d] a lot of trouble." James and Amy routinely purchased abandoned storage units and wholesale items, and they conducted large yard sales at their property which up to 2,500 patrons might attend in a day. They were hosting such an event on the day of the shooting.

{¶ 9} James and his wife wore fluorescent yellow shirts at all their sales to be easily identifiable to patrons. James is six feet four inches tall and, on the date of the shooting, he weighed approximately 300 pounds. At one point during the August 4, 2023 sale, he went to a metal shed on his property to obtain a TV cord. Jeffers had been firing a gun repeatedly at the time. James said Jeffers did that "especially when we're outside doing anything." James heard repeated "tings" from his shed. James could see "a big gaping

hole and a light shining through" his shed, and he called 911.

{¶ 10} James testified that officers arrived and began an investigation. He walked to the shed with Dep. Peterson and Chief Stitzel. When James opened the shed, he observed holes in the trusses in the door, and a bullet had passed through a dog's bed and a mannequin that were stored in the shed. When James, Peterson, and Stitzel began to walk back toward the garage sale, Jeffers opened fire again. According to James, the gun sounds "were just pop, pop, pop. This time it was different." James heard a "whoosh" or "whistling sound" going right by their heads. The three men dropped to the ground, and James started "doing the death crawl" as he tried to get behind his horse barn and heard the bullets getting closer. As they were on the ground, James thought it sounded like Jeffers had "lowered the gun." James testified that his shed had been a month old at the time of this incident, and it did not have any bullet holes before that day. He identified photos of bullet holes in the shed. James did not know the area from which Jeffers had been shooting when James was on the ground.

{¶ 11} Detective Brian Melchi of the Clark County Sheriff's Office testified that, on August 4, 2023, he responded to James's address to assist numerous deputies already at the scene on a report of shots fired and "an ongoing neighbor dispute." Melchi made contact with Jeffers at his front door. Due to the reported gunfire, Melchi asked, "as we normally do, [to] check for proper backstops." According to Melchi, officers "were denied access to go all the way to the back but [Jeffers] showed us the pathway that he was shooting down."

{¶ 12} Melchi testified that as he and other officers proceeded back toward

James's property, shots were fired from Jeffers's property.  Melchi spoke to Stitzel, Peterson, and James.  A decision was made to charge Jeffers with criminal damaging based upon damage to the shed.  Melchi subsequently returned to Jeffers's residence to collect the firearm by means of a search warrant.  On the day of the shooting, a bullet was collected from the shed, which Melchi identified.

{¶ 13} Melchi stated that Jeffers was cooperative with him and that, to the best of Melchi's knowledge, Jeffers had been target shooting down the pathway that was seen on a body camera.  Melchi stated that, when he first interacted with Jeffers, there had been no reason to take the gun from Jeffers.  Melchi had not known that James, Peterson, and Stitzel were proceeding to the area of the shed and had not been personally award that anyone was "back that close."

{¶ 14} Officer Cody Anderson of the Springfield Police Department Crime Scene Investigations Unit responded to Jeffers's address on October 3, 2023, to assist the Sheriff's office.  Anderson testified that he had been asked to conduct aerial photography with a drone; he identified an aerial photo he had taken of the scene and a report he had created.  Anderson's report identified seven points of interest on the aerial photo of the scene, including: the rear area of Jeffers's home (near the center of the aerial photo); a "bench rest" at the top of the shooting range to the left of Jeffers's home; the backstop to the shooting range, a bale of hay with a suspected bullet strike; the shed with two suspected bullet strikes; and a symbol marking the approximate location of James, Peterson, and Stitzel when they were fired upon.

{¶ 15} Anderson also identified photos of an entrance bullet hole on the side of the

shed facing the rear of Jeffers's home and of the exit mark from the bullet. He also identified entrance and exit marks from a bullet along the roof of the shed. Anderson stated that the aerial photo of the scene reflected that the shed was in "[a]lmost a straight line" from the rear of Jeffers's home.

{¶ 16} Gene Mosteller had been present at the garage sale with his son on August 4, 2023. He testified that he had heard gunfire in the area of James's home, and James had ushered them toward the garage because someone was apparently shooting at a building at the rear of the home. Mosteller "could hear and see muzzle fire," and there were "multiple shots in a row." Mosteller testified that he could see the muzzle fire through the trees every time the gun fired, and it "was like 4 to 6 inches." However, Mosteller acknowledged that he had not included his viewing of "muzzle fire" in his statement to police.

{¶ 17} Police Chief Stitzel of the German Township Police Department was on his way to work, near the garage sale, on the date of the incident, and he slowed down to read the hours of the sale on a sign. Stitzel heard a few gunshots go off and pulled into James's driveway. He observed people looking around "franticly" and moving around like they were trying to get cover. Stitzel observed James on the phone, and James said, "he shot at me." Stitzel called dispatch and told James to move the people around the back, close to the building, while they figured out what was going on. They then waited for other officers to arrive.

{¶ 18} After learning from James that he heard shots hitting the shed, Stitzel, James, and Dep. Peterson proceeded to investigate that area. As soon as they walked

up, they could see that there were some holes in the shed. They also observed a bullet inside the shed. Peterson stayed to take pictures and collect evidence while Stitzel and James headed back to the house. According to Stitzel, on their way back, they heard "an abundance of gunfire" and "all of a sudden bullets [were] coming" by their heads. Stitzel said the bullets were "zinging" and "close," so they "took cover on the ground" and headed for the barn. Stitzel stated that he had been shot at before and this was "the loudest" he'd ever heard: "I've been in law enforcement for a total of 31 years, shot multiple rounds," and "[w]hen a bullet is directly shot at you, it's more of a whistling gunning, sound to you. And the louder it is, the closer it is." Stitzel "[a]bsolutely" believed he was under deliberate gunfire, and it gave him chills to recall the event. Stitzel was armed, and he stated that, if he had been able to determine where the shooter was located, he would have returned fire.

{¶ 19} At the conclusion of the State's evidence, defense counsel moved for an acquittal. The court overruled the motion.

{¶ 20} Jeffers and his girlfriend, Margaret Lou Bickenheuser, testified for the defense. Bickenheuser testified that she had resided on Ballentine Pike in Springfield with Jeffers on the date of the shooting; at the time, her mother had lived there as well. Bickenheuser described the shooting range on the property and the backstop. She testified that, on the date of the shooting, Jeffers was working on a gun while she fed their animals on the property. She acknowledged that Jeffers had shot some rounds as practice between her feedings.

{¶ 21} While outside, Bickenheuser was called over to the property line by Chief

Stitzel, who wanted to talk to Jeffers. Additional deputies arrived at the scene, and Jeffers showed them the gun range. Bickenheuser spoke to Det. Melchi about a June 2022 letter she had sent to the Sheriff's Department regarding concerns she had with their neighbor, James. According to Bickenheuser, after the deputies viewed the shooting range, they told Jeffers it was okay to shoot at the range, and she and Jeffers "went back about [their] business." Bickenheuser saw Jeffers return to the shooting range, and then he drove to the Dollar Store. According to Bickenheuser, when Jeffers returned, officers approached him, and he went into the house "very upset" and said, "they are after me." Bickenheuser asked what had happened. She testified that, when she walked back outside, several guns were pointed at her and she asked what was going on. Jeffers was then placed under arrest.

{¶ 22} On cross-examination, Bickenheuser testified that Jeffers had been firing a .223 caliber pistol at the range on the date of the shooting. She stated that the weapon was very loud but did not produce much muzzle flash. According to Bickenheuser, Jeffers was knowledgeable about guns and was a good shot. She stated that the line of sight from where Jeffers was firing at the shooting range to the area where the deputies hit the ground was obscured by trees.

{¶ 23} Jeffers testified that he was a retired cabinet builder and furniture maker, and he had had "a gun hobby" for about 60 years, which included owning and building various firearms. He fired weapons at the shooting range two to three times a week.

{¶ 24} With respect to his relationship with his neighbor, James, Jeffers testified that, before he met James, he had observed a bright light outside, and he and

Bickenheuser ran outside with flashlights because they believed James's house might be on fire; as they were running across the yard, they heard "this voice that comes out of the dark," which said, "put those F-ing flashlights out or I'm going to put a bullet in your brain. And that's how we met Mr. James."

{¶ 25} Jeffers testified that, on August 4, 2023, he was test firing an AR-15 pistol on his gun range. He was unaware that officers were in the area and, based on the evidence that had been presented at trial, he said that "there's no way that I could have seen anybody in the back view from where I was standing in my gun range because . . . the bushes and everything grow up. It's like being in a tunnel." Jeffers testified that he does not fire his weapons near his home so as not to startle Bickenheuser's mother. He also stated that he wouldn't shoot at a police officer because he has friends who are officers.

{¶ 26} After shooting his gun, Jeffers returned home and put his gun into his gun safe. He then went to the Dollar Store after being told by Dep. Peterson that it was okay right for him to leave. He testified that, when he left, there were "up to 20 officers running around all over the place," and they were still there when he returned. Jeffers indicated that he was "not an angry person."

{¶ 27} On cross-examination, Jeffers stated that he had "had some issues with" the gun he was test firing on August 4, 2023; when he pulled the trigger, nothing happened -- the gun did not fire. Jeffers testified that he had not yet figured out what the issue was when his gun was taken by law enforcement officers.

{¶ 28} Jeffers testified that he had not seen James on August 4, 2024, and that he

had never fired at James's shed; he had been shooting at a target in his back range, in an area from which he couldn't "observe anybody on the right side." Jeffers denied shooting from his back porch. He stated that he had had a compensator on the gun he was firing, which reduced muzzle flash.

{¶ 29} Jeffers renewed his motion for acquittal at the close of the evidence. The court again overruled the motion, and Jeffers was convicted as described above.

{¶ 30} Jeffers appeals from his convictions, raising five assignments of error.

### Sufficiency and Weight of the Evidence

{¶ 31} We will consider the first two of Jeffers's assignments of errors together. They allege that his convictions were supported by insufficient evidence and were against the manifest weight of the evidence. Related to sufficiency, Jeffers argues that the State did not prove the knowing element of felonious assault; there was no evidence that, when he shot, he meant to hit any of the three alleged victims. Jeffers notes that this was not a drive-by shooting, where someone was accidentally shot, or a shooting into a home, where it was unknown if someone was inside. Jeffers asserts that he and Melchi did not know there was anyone in the area where James, Peterson, and Stitzel hit the ground. He points out that Bickenheuser testified that he was firing at his shooting range, and no one observed him shooting from his back porch.

{¶ 32} In his second assignment of error, Jeffers argues that "[i]mportant credibility issues" show that the jury lost its way and his conviction was against the manifest weight of the evidence. Specifically, Jeffers argues that there "is no way [Mosteller] could have seen any muzzle flash" from Jeffers's gun because there were trees between Mosteller

and his home.  He also argues that the State's theory that he had fired at James, Stitzel, and Peterson from his back porch was not credible.

{¶ 33} In *State v. Thompkins*, 78 Ohio St.3d 380 (1997), the Supreme Court of Ohio clarified the distinction between appellate review of the sufficiency of the evidence and appellate review of the weight of the evidence.  A sufficiency of the evidence argument relates to whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *Thompkins*.  "In essence, sufficiency is a test of adequacy.  Whether the evidence is sufficient to sustain a verdict is a question of law." *Thompkins* at 386.

{¶ 34} The test for sufficiency of the evidence was set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991):

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.  In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.  *Thompkins* at 390.

**{¶ 35}** A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983), which states:

> [T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

"In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." *Wilson* at ¶ 14, citing *State v. McDaniel*, 1998 WL 214606 (2d Dist. May 1, 1998). "Typically, in manifest weight review, we defer to trial court's decisions on credibility issues, as those courts are in the best position to make that determination." *State v. Curtis*, 2020-Ohio-4152, ¶ 20 (2d Dist.), citing *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).

**{¶ 36}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State*

*v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Robinson* at ¶ 17, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

**{¶ 37}** R.C. 2903.11 defines felonious assault, and the definition contained at R.C. 2903.11(A)(2) states that no person shall knowingly cause or attempt to cause physical harm to another by means of a deadly ordnance.

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B). Because James, Peterson, and Stitzel were not physically harmed during the shooting, to convict Jeffers pursuant to R.C. 2903.11(A)(2), the State had to establish that Jeffers knowingly attempted to cause them physical harm by means of his weapon.

**{¶ 38}** Having reviewed the entire record, we conclude that Jeffers's conviction was not against the manifest weight of the evidence and was, accordingly, supported by sufficient evidence. Off. Anderson's testimony and the aerial photo of the scene reflect

that James's shed was at the end of a straight line to the north from the rear area of Jeffers's home. Anderson testified that the bullet holes in the south side of the shed and the hay bale faced the rear of Jeffers's home. In a straight line from the shed to the right is a fenced area outside of what appears to be a barn or garage on James's property.

{¶ 39} James heard Jeffers firing a weapon in the course of the garage sale, and he stated that Jeffers often did so if James or his wife were outside. James heard "tings" from the shed as he approached it to retrieve a cord. James, who was a large man, was dressed in a neon shirt to make himself highly visible at the time, and the view of the area around the shed was open and unobstructed from Jeffers's home.

{¶ 40} After investigating the shed area and observing bullet damage, James, Peterson, and Stitzel each testified that they were fired upon at close range as they proceeded back toward James's home. Their testimony was also consistent with body camera video. They described a loud whistling sound over their heads and believed they had been subject to a deliberate attack. Stitzel, who had 31 years of law enforcement experience, stated that the louder a bullet sounds whistling past, the closer it is.

{¶ 41} Jeffers's shooting range was to the left of his home and, according to his testimony, when he fired within the range toward the backstop, he was in "a tunnel" of trees and tall growth. The aerial photo showed trees and outbuildings on the right side of the shooting range between Jeffers's property and James's property. There was no evidence that anyone other than Jeffers had been firing a weapon on August 4, 2023. James, Bickenheuser, and Jeffers testified about an ongoing dispute between the neighbors, and Bickenheuser testified that Jeffers had been upset and believed "they are

after me" after he spoke to Bowers and Melchi. Jeffers was knowledgeable about guns and a good shot, according to Bickenheuser.

{¶ 42} After Bowers and Melchi spoke to Jeffers at his front door, Bowers testified that multiple gunshots were heard in proximity to his location such that he could feel the "bang." Bowers did not believe that Jeffers could have returned to his shooting range from his front porch before the shots began.

{¶ 43} The jury clearly credited the testimony of the State's witnesses over that of Jeffers and Bickenheuser, and we defer to the jury's assessment of credibility. In other words, the jury discredited Jeffers's and Bickenheuser's testimony that Jeffers had been merely test firing a weapon on his shooting range, from which location he was unable to view James's property.

{¶ 44} The State's evidence, if believed, supported a conclusion that Jeffers had fired at the area of James's shed from the rear of Jeffers's home, while James was having a "massive garage sale,". After law enforcement responded to the scene and confronted Jeffers at his home, an upset Jeffers fired again in the area of the field where James, who was dressed to be seen, Peterson, and Stitzel were walking back to James's home. We reach this conclusion regardless of whether Mosteller observed "muzzle fire."

{¶ 45} Based upon the foregoing, we cannot conclude that the jury lost its way in determining that Jeffers was aware that shooting his weapon in the area of James, Peterson, and Stitzel would probably result in physical harm to them by means of the weapon. Thus, it did not lose its way in concluding that Jeffers acted knowingly, and Jeffers's felonious assault convictions were not against the manifest weight of the

evidence. As such, they were also supported by sufficient evidence. Accordingly, Jeffer's first two assignments of error are overruled.

## Jury Instruction on Acting Knowingly

{¶ 46} Jeffers's third and fourth assignments of error assert that the trial court erred in giving an incorrect jury instruction and that his right to due process was violated by the court's giving a jury instruction requested by the State. We will address these arguments together.

{¶ 47} During a recess at the conclusion of the evidence, the following exchange occurred:

[DEFENSE COUNSEL]: The State is asking to add an additional [instruction that] firing weapon into an area without knowledge of its occupants is sufficient to establish knowing attempt to cause physical harm to the purpose of felonious assault conviction. The case that they cite is a drive-by shooting where the person hit an innocent bystander. I think the facts in this case are completely in opposite [sic] to the State versus Moore which is an unreported case, out of this District but unreported.

. . .

[THE PROSECUTOR]: The State believes that the correct statement of law, Your Honor, [is] from the Second District in State v. Moore. It follows the case law as cited in the opinion from Ohio Sixth and Eighth Appellate Districts which have that language and they also cite it in the Ohio Supreme Court case in State v. Mills where it's talking about line of fire. We believe

the correct statement of law should be included.

{¶ 48} The case the parties were discussing was *State v. Moore*, 2023-Ohio-4445 (2d Dist.).

{¶ 49} The court overruled the defense's objection to including the proposed instruction. After instructing the jury on the culpable mental state of knowingly, consistent with R.C. 2901.22(B), as set forth above, the court further instructed the jury as follows:

> The firing of a weapon into an area without knowledge of its occupants is sufficient to establish a knowing attempt to cause physical harm for the purpose of a felonious assault conviction. Cause is an act which in a natural and continuous sequence directly produces physical harm to a person and without which it would not have occurred.

{¶ 50} Jeffers argues that he did not fire into a crowd, did not know anyone was near the shed, and did not fire his weapon at anyone. He asserts that shooting into a backstop did not satisfy the knowing element of felonious assault. According to Jeffers, either he was firing from his shooting range or his back porch, "and in either case, he would be convicted" under the erroneous instruction given by the judge. He argues that, while the appellant in *Moore* was trying to injure or kill someone, Jeffers was only "test firing a weapon into a backstop." He argues that the instruction relieved the State of its burden because it misstated the law, made this offense a strict liability offense, and made it easier to convict him.

{¶ 51} The State responds that the court did not err in instructing the jury and, if

there was any error, it was harmless.   The State argues that Jeffers's "interpretation of the case law would have this intentional firing across someone else's property not rise to the level of knowingly attempting to cause physical harm by means of a deadly weapon." The State asserts that the instruction was not erroneous, but even if it were, the error was harmless because the amount of evidence presented by the State "discount[ed] the need for the instruction."

{¶ 52} " 'The purpose of jury instructions is to properly guide the jury' in deciding questions of fact based on the applicable substantive law."   *State v. Rac*, 2019-Ohio-893, ¶ 13, quoting *Griffis v. Klein,* 2004-Ohio-3699, ¶ 48 (2d Dist.).   "Although a trial court 'has broad discretion to decide how to fashion jury instructions,' such instructions must 'present a correct, pertinent statement of the law that is appropriate to the facts' of the case."   *Id.* at ¶ 15, quoting *State v. White,* 2015-Ohio-492, ¶ 46, citing *State v. Griffin*, 2014-Ohio-4767, ¶ 5.   "Accordingly, 'a court should not give an instruction unless it is specifically applicable to the facts in the case.' "   *Id.,* quoting *State v. Fritz*, 2005-Ohio-4723, ¶ 19 (2d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266 (1981).   " 'A trial court has discretion to determine whether the evidence adduced at trial was sufficient to warrant an instruction.' " *Id.,* quoting *State v. Austin*, 2018-Ohio-3048, ¶ 54 (8th Dist.), citing *State v. Fulmer*, 2008-Ohio-936, ¶ 72.   " 'In reviewing the record to ascertain the presence of sufficient evidence to support the giving of a [particular] jury instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.' "   *Id.,* quoting *State v. Stevens*, 2017-Ohio-498, ¶ 37 (12th Dist.).

{¶ 53} "We review a trial court's jury instructions for an abuse of discretion." *State v. Barker*, 2022-Ohio-3756, ¶ 18 (2d Dist.), citing *State v. Portis,* 2012-Ohio-608, ¶ 47 (2d Dist.), citing *State v. Jones*, 2015-Ohio-5029, ¶ 13 (12th Dist.). " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' " *State v. Morris,* 2012-Ohio-2407, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157 (1990). It also encompasses arbitrary and unconscionable decisions. *AAAA Ents.* at 161. " 'An appellate court may not reverse a conviction in a criminal case based upon jury instructions unless "it is clear that the jury instructions constituted prejudicial error." ' " *Barker* at ¶ 18, quoting *Portis* at ¶ 47. "We must review the instructions as a whole, and, if taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found premised upon the possibility that the jury may have been misled." *Id*.

{¶ 54} In *Moore*, 2023-Ohio-4445 (2d Dist.), we noted that "Ohio's Sixth and Eighth appellate districts have held that the firing of a weapon into an area without knowledge of its occupants is sufficient to establish a knowing attempt to cause physical harm for the purpose of a felonious assault conviction." *Id.* at ¶ 48, citing *State v. Hill*, 2020-Ohio-1237, ¶ 19-20 (6th Dist.); *State v. Elko*, 2004-Ohio-5209, ¶ 54 (8th Dist.), *overruled in part on other grounds, State v. Ford*, 2011-Ohio-765; *State v. Ivory*, 2004-Ohio-2968, ¶ 6 (8th Dist.). "In a drive-by shooting case involving five victims, this court similarly noted that 'intent to cause physical harm to the five individuals could be inferred from [the defendant's] having shot a gun randomly in the direction of each individual." *Id.,* citing

*State v. Phillips*, 75 Ohio App.3d 785, 792 (2d Dist. 1991).

**{¶ 55}** *Moore* further noted that, "when determining whether there was sufficient evidence to establish that the defendant had knowingly attempted to cause physical harm to a bystander of a bank robbery, the Supreme Court of Ohio evaluated whether the bystander was 'in the line of fire.' " *Id.* at ¶ 49, quoting *State v. Mills*, 62 Ohio St.3d 357, 369. "Because the bystander was not found to have been in the line of fire, the *Mills* court concluded that there was insufficient evidence to establish that the defendant had knowingly attempted to cause the bystander physical harm and thus reversed the felonious assault conviction associated with the bystander." *Id.,* citing *Mills.*

**{¶ 56}** As discussed in *Moore,* the instruction provided by the trial court was a correct statement of law. Jeffers's version of events was that he did not know anyone was in the relevant area of James's property and did not fire at anyone. The court merely instructed the jury that firing a weapon without knowledge of whether there were any occupants in the area established a knowing attempt to cause physical harm to those present. Put differently, such an act is done knowingly when the person is aware that the shooting will probably cause physical harm by means of the weapon. *See* R.C. 2901.22(B).

**{¶ 57}** *Moore* involved a drive-by shooting in which multiple shots were fired at a truck parked in a residential neighborhood as the driver, his infant daughter, and the driver's brother were exiting the vehicle. *Id.* at ¶ 4. The infant was uninjured, and Moore argued that the State had failed to present evidence that he knowingly attempted to cause physical harm to the baby by means of a deadly weapon, because the State did not

present any evidence establishing that he knew the infant was present during the shooting. *Id.* We found that it was "enough that Moore's conduct was of such a nature that he would have been aware it could have caused someone inside or near the truck to become physically injured." *Id.* at ¶ 52. The same is true here. In firing his weapon across James's property during a "massive garage sale" *after* having fired into the area of the shed and having been questioned by officers, Jeffers had to have been aware that firing again could have caused someone on the property to be physically injured. Even if the jury had credited Jeffers's testimony that he was unaware of the presence of James, Peterson, and Stitzel, the knowingly element would have nevertheless been established. The record contains evidence from which reasonable minds could have concluded that Jeffers acted knowingly, and prejudicial error in the giving of the instruction is not demonstrated. Even if we were to conclude that the court erred in giving the instruction based upon *Moore* (which we do not), any error would have been harmless based upon the entirety of the instructions on the element of knowingly and the overwhelming evidence of Jeffers's guilt. Accordingly, Jeffers's third and fourth assignments of error are overruled.

### Sentencing

{¶ 58} Jeffers's fifth assignment of error asserts that the trial court erred in sentencing him for each of the counts in the indictment.

{¶ 59} "When reviewing felony sentences, a court of appeals must apply the standard of review set forth in R.C. 2953.08(G)." *State v. Williams*, 2022-Ohio-2897, ¶ 18 (2d Dist.), citing *State v. Farra*, 2022-Ohio-1421, ¶ 73 (2d Dist.). Under that statute, an

appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, if it "clearly and convincingly finds either (1) the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.).

{¶ 60} We may not independently weigh the evidence in the record and substitute our judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12. *State v. Bartley*, 2023-Ohio-2325, ¶ 9 (2d Dist.), quoting *State v. Jones*, 2020-Ohio-6729, ¶ 42. "The inquiry is simply whether the sentence is contrary to law." *Id.* "A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12." *Id.*, citing *State v. Dorsey*, 2021-Ohio-76, ¶ 18 (2d Dist.).

{¶ 61} Jeffers's three felonious assault offenses were felonies of the second degree, and the court ordered concurrent prison terms. R.C. 2929.14(A)(2)(a) states: "For a felony of the second degree committed on or after March 22, 2019, the prison term shall be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and maximum term that is determined pursuant to section 2929.144 of the Revised Code." R.C. 2929.14(A)(3) states:

If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that all of the prison terms imposed are to run concurrently, the maximum term shall be equal to the longest of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the

Revised Code for a qualifying felony of the first or second degree for which the sentence is being imposed plus fifty percent of the longest minimum term for the most serious qualifying felony being sentenced.

{¶ 62} The court imposed a minimum term of eight years (within the statutory range) on all of the offenses, and there the maximum term was 12 years (eight years plus 50% of eight years). The court's judgment entry stated that the court had considered R.C. 2929.11 and 2929.12 in imposing sentence. Therefore, the sentence was properly imposed. Jeffers's fifth assignment of error is overruled as it relates to the sentences for the felonious assault offenses.

### *Applicability of State v. Beatty*

{¶ 63} On January 22, 2025, we ordered the parties to brief the application of the Ohio Supreme Court's decision in *State v. Beatty,* 2024-Ohio-5684, to Jeffers's sentence. As noted above, Jeffers was sentenced to three-year terms on each firearm specification, all to be served consecutively to each other and to the concurrent indefinite terms for the felonious assaults   On February 7, 2025, Jeffers file a brief asserting that *Beatty* requires us to remand the matter for resentencing, and the State concedes that the trial court was only permitted to impose consecutive firearm-specification terms if the firearm-specification terms were mandatory.

{¶ 64} At disposition, the following exchange occurred:

THE COURT:   . . .

I think [the prosecutor] mentioned this, I don't know if he cited the statute but R.C. 2929.14(B)(1)(G) basically says, if an offender is convicted of two

or more felonious assault offenses and convicted of the firearm specification, that the Court shall impose on the offender the firearm specifications for each of the two most serious specifications which he's convicted.

And then it also gives the Court the discretion, the Court may also impose that specification for any or all of the remaining specifications. So I don't believe any of these specifications merge for purposes of sentencing based on that statute.

All right. One more question for Counsel. If, given the statute I just cited, if the Court were to run any of the sentences concurrently do you believe that statute is saying that the gun specifications nevertheless have to run consecutively?

[THE PROSECUTOR]: Yes, Your Honor, on at least two of those counts.

[DEFENSE COUNSEL]: Yes, Your Honor.

The court's judgment entry stated that, pursuant to R.C. 2929.14(B)(1)(g), all three firearm specifications were run consecutively to one another and consecutively to the 8-12 year concurrent prison terms for the felonious assaults.

{¶ 65} Insofar as it is relevant here, the defendant in *Beatty* was found guilty of four counts of felonious assault with four attendant firearm specifications. *Id.* at ¶ 2. The court imposed three-year prison terms for each specification, two of which were mandatory pursuant to R.C. 2929.14(B)(1)(g), and two were imposed at the trial court's discretion, as also authorized by R.C. 2929.14(B)(1)(g). The court ordered consecutive

service on all the firearm specifications, for a total of 12 years.   *Id.* at ¶ 3.   Beatty argued on appeal that "only two of his four firearm-specification prison terms should run consecutively and that the trial court's decision to run all four of those prison terms consecutively was not permitted by R.C. 2929.14 (C)(1)."   *Id.* at ¶ 4.

{¶ 66}   "R.C. 2929.14(B)(1) governs the imposition of prison terms for firearm specifications connected to felony offenses."   *Id.* at ¶ 10.   "It states that 'if an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a [firearm] specification . . . the court shall impose' a prison term for the specification."   *Id.*, quoting R.C. 2929.14(B)(1)(a).   *Beatty* noted, however, that "the statute states that a trial court '*shall not* impose more than one prison term on an offender under [R.C. 2929.14(B)(1)(a)] committed as part of the same act or transaction.' "   *Id.*, quoting R.C. 2929.14(B)(1)(b).

{¶ 67} R.C. 2929.14(B)(1)(g) provides the following exception:

If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are . . . felonious assault, . . ., and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining

specifications.

{¶ 68} Accordingly, "if an offender is convicted of a group of offenses and firearm specifications that were all part of the same transaction, the trial court must impose one prison term for the firearm specifications and it must not impose prison terms for any other firearm specifications." *Id.* at ¶ 10, quoting R.C. 2929.14(B)(1)(g). However, "if any of the offenses is a serious felony such as murder or felonious assault, the trial court *must* impose prison terms for two of the firearm specifications and it *may* impose prison terms for two of the firearm specifications." *Id.* at ¶ 10. "Because the trial court 'must' impose prison terms for two of the firearm specifications, those prison terms are 'mandatory prison term[s].' " *Id.*, citing R.C. 2929.01(X)(1), defining a mandatory prison term.

{¶ 69} *Beatty* reviewed R.C. 2929.41(A), which provides a presumption of concurrent service as follows: " 'Except as provided in [R.C. 2929.41(B), 2929.14(C), or 2971.03(D) or (E)], a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment imposed by a court of this state, another state, or the United States.' " *Id.* at ¶ 11.

{¶ 70} *Beatty* further discussed R.C. 2929.14(C)(1)(a), which states:

Subject to division (C)(1)(b) of this section, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(a) of this section for having a firearm on or about the offender's person or under the offender's control while committing a felony, if a mandatory prison term is imposed upon an offender pursuant to division (B)(1)(c) of this section for committing a felony specified in that division by discharging a firearm from a motor

vehicle, or if both types of mandatory prison terms are imposed, the offender shall serve any mandatory prison term imposed under either division consecutively to any other mandatory prison term imposed under either division or under division (B)(1)(d) of this section, consecutively to and prior to any prison term imposed for the underlying felony pursuant to division (A), (B)(2), or (B)(3) of this section or any other section of the Revised Code, and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender.

In other words, "if a court imposes a 'mandatory prison term' for a firearm specification, it must be served consecutively to any other 'mandatory prison term' imposed for the enumerated specifications and consecutively to the prison term for the underlying felony to which the specification is attached." *Id.* at ¶ 12.

{¶ 71} *Beatty* determined:

There is no dispute that the trial court was required to impose prison terms for two of the four firearm specifications attached to Beatty's felonious-assault offenses under R.C. 2929.14(B)(1)(g) and that the trial court was required to run those two prison terms consecutively under R.C. 2929.14(C)(1). There is also no dispute that the trial court had the discretion to impose prison terms for the remaining two firearm specifications under R.C. 2929.14(B)(1)(g). The sole dispute is whether the two additional prison terms can or must run consecutively.

*Id.* at ¶ 14.

{¶ 72} *Beatty* noted that "the plain language of R.C. 2929.41(A) evidences the General Assembly's intent that all prison terms – including those for firearm specifications – run concurrently unless a specific exception applies within the statutory provisions enumerated in R.C. 2929.41(A)." *Id.* at ¶ 17. *Beatty* determined that the "only statutory provision allowing for consecutive prison terms for firearm specifications – R.C. 2929.14(C)(1)(a) – applies to 'mandatory prison term[s]' only, and therefore does not apply to prison terms imposed at the trial court's discretion under R.C. 2929.14(B)()(1)(g)." *Id.* at ¶ 26. Accordingly, *Beatty* concluded that "[t]he General Assembly has not given trial courts the power to require that discretionary prison terms for firearm specifications be served consecutively, and therefore, under R.C. 2929.41(A), such prison terms 'shall be served concurrently' with other prison terms." *Id.* at ¶ 27.

{¶ 73} Pursuant to *Beatty*, we agree with the parties that the trial court erred in imposing a consecutive sentence for a discretionary firearm specification (the third firearm specification), and that portion of Jeffers's sentence is contrary to law. As such, the trial court's judgment will be reversed with respect to that sentence and remanded for resentencing on the third firearm specification.

## Conclusion

{¶ 74} Jeffers's conviction was not against the manifest weight of the evidence and was supported by sufficient evidence. The trial court did not abuse its discretion in instructing the jury, and Jeffers's sentences for the felonious assault offenses and the first two firearm specifications were not contrary to law. The consecutive sentence on the third, discretionary firearm specification was contrary to law. The trial court's judgment

is reversed with respect to the sentence on the third firearm specification, and the matter is remanded to the trial court for resentencing on that firearm specification consistent with *State v. Beatty,* which requires the trial court to impose the non-mandatory three-year sentence concurrently with the other prison terms. In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.